CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
September 30, 2025
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RAHSAN DRAKEFORD,            ) | |
| ) | |
| Plaintiff,            ) | Case No. 7:24-cv-00041 |
| ) | |
| v.            ) | **MEMORANDUM OPINION** |
| ) | |
| UNIT MNGR. EARHEART, *et al.*,            ) | By:   Hon. Thomas T. Cullen |
| ) |         United States District Judge |
| Defendants.            ) | |

Plaintiff Rahsan Drakeford, a Virginia inmate proceeding *pro se*, filed this civil-rights action under 28 U.S.C. § 1983 against several employees of the River North Correctional Center ("RNCC"). (*See* Compl. [ECF No. 1].) Now before the court is Defendants' joint motion for summary judgment on Plaintiff's claims. (*See* Defs.' Mot. for Summ. J. [ECF No. 39].) For the following reasons, the court will grant Defendants' motion and award summary judgment in their favor.

I.

At all times relevant to Plaintiff's claims, he was a state inmate housed at RNCC. (*See* Compl. 1–7.) His claims stem from allegations that Defendants lodged false charges against him and punished him for those charges in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. (*See id.* at 4–7.) Specifically, he alleges that Defendant Unit Manager E. Earhart used his authority as unit manager to unjustifiably confine Plaintiff to a "dry cell" for an extended period of time. (Supplemental Compl. 1 [ECF No. 22] (referring to Earhart as "[the] central figure in this case").) He alleges that, while in the dry cell, he was

deprived of "all basic amenities," including clothing, shoes, soap, toothpaste, and other hygiene items. (*Id.*)

He further claims that Defendant Lieutenant May participated in the unconstitutional conduct, under Earhart's orders, by transporting him to the dry cell, subjecting Plaintiff to an allegedly unlawful strip search, and giving Plaintiff only a "turtle suit" to wear after the search was complete. (*Id.*) He claims that Defendant Sergeant Bemis participated in the constitutional violation by routinely inspecting his cell and confiscating meals and toilet paper Plaintiff had saved, leaving his cell "deserted." (*Id.*) He further claims that Defendant Intel Officer Hartman improperly refused to arrange for a scanner check in lieu of daily stool checks and that, once a scanner check was finally arranged and provided a negative finding, he nevertheless upheld Defendant Lieutenant Hickman's orders to keep Plaintiff confined. (*Id.*)

In support of their motion for summary judgment, Defendants Earhart, May, Bemis, Hartman, and Hickman offer the following evidence.

Plaintiff was incarcerated at RNCC from October 22, 2021, through February 27, 2024, when he was transferred to Wallens Ridge State Prison. (Aff. of E. Earhart ¶ 4 [ECF No. 48-1].) On August 3, 2023, Plaintiff was being housed in the D-2 pod, cell 230 at RNCC. (*Id.* ¶ 6.)

Around 1:30 p.m. that day, Plaintiff was exiting his cell and appeared to passing officers to be impaired. (*Id.* ¶ 13 & Encl. C.) A pat-down search revealed that Plaintiff was carrying empty commissary chip bags, cellophane, and several small pieces of paper. (*Id.*) He was asked to give a urine sample for drug testing and responded, "What's this about[?] I don't want to pee." (*Id.*) Sergeant Warf and Lieutenant Whitt then performed a strip search of Plaintiff. (*Id.*) When, during the search, Plaintiff was directed to open his mouth, he pushed a white, square-

shaped object out with his tongue. (*Id.*) The object appeared shiny and plastic wrapped. (*Id.*) Unit Manger H. Colna, who was present during the interaction, ordered Plaintiff to spit the object out. (*Id.* ¶ 14 & Encl. C.) But rather than spitting it out as directed, Plaintiff swallowed the item. (*Id.*) Because Plaintiff refused to submit to a drug test and swallowed the item in his mouth, Colna charged him with "Refusal to Submit to a Drug Test" and referred Plaintiff to the restrictive housing unit ("RHU"). (*Id.*) Later that day, the Institutional Classification Authority ("ICA") conducted a hearing and recommended that Plaintiff be assigned to RHU. (*Id.* ¶ 20.)

About an hour after Plaintiff refused the drug test, around 2:30 p.m., Colna, Whitt, and Warf, searched Plaintiff's cell. (*Id.* ¶ 10.) While searching the TV stand area surrounding Plaintiff's bed, Colna discovered a white piece of paper with three orange spots soaked into it and a well-worn nasal spray bottle containing a reddish orange liquid that did not appear to be the original contents of the bottle. (*Id.* ¶ 6; Aff. of R. Hickman ¶ 4.)

Colna contacted the RNCC Institutional Investigators office and asked that an investigator bring an evidence bag to secure the items, which she suspected to be evidence of drug activity. (Aff. of E. Earhart ¶ 7 & Encl. A.) Intel Officer Lowe brought an evidence bag to Plaintiff's cell, and Colna placed the items in the bag. (*Id.*; Aff. of R. Hickman ¶ 5.) After a chain of custody form was filled out, Lowe took the evidence and left the building. (Aff. of E. Earhart ¶ 7 & Encl. A; Aff. of R. Hickman ¶ 5 & Encls. A–E.)

Later that day, Lt. Whitt charged Plaintiff with "Possession of Contraband" and noted in his disciplinary report that the search of Plaintiff's cell yielded the following contraband items: a bag of hot sauce from staff dining, two whole onions, a large bag containing roughly

three cups of cheese from the kitchen, one pound of sliced buffalo chicken deli meat, one mayonnaise bottle filled with sweet tea from staff dining, two electric stingers, and one loose razor blade. (Aff. of E. Earhart ¶ 10 & Encl. B.)

On August 14, 2023, Sgt. West conducted a disciplinary hearing on Plaintiff's possession-of-contraband charge and his refusal-to-submit-to-a-drug-test charge and found him guilty of both. (*Id.* ¶¶ 11, 15 & Encls. B, C.) Plaintiff was fined $10 for possessing contraband. (*Id.* ¶ 11 & Encl. B.) Plaintiff appealed the contraband conviction, but Warden Anderson upheld the conviction on review and determined Plaintiff had been afforded due process. (*Id.*) Plaintiff appealed Anderson's decision to Regional Administrator Thomas Meyer, who also upheld the conviction and found no violation of due process. (*Id.* ¶ 12.) For refusing a drug test, Plaintiff was penalized with a 50-day loss of good-conduct allowance or equivalent sentence credits. (*Id.* ¶ 15 & Encl. C.) Plaintiff appealed this conviction as well but both Anderson and Meyer upheld his conviction and found no due-process violations had been committed. (*Id.* ¶¶ 15–16.)

Defendant Earhart was not present during the Plaintiff's pat down, when Plaintiff swallowed the suspected drug, or during the search of Plaintiff's cell. (*Id.* ¶¶ 9, 17.) At the time, Earhart was unit manager of the A Building and responsible for the daily operation of that building, not the D Building where Plaintiff was housed. (*Id.* ¶ 18.) Earhart did not place any disciplinary charges against Plaintiff on August 3, 2023, nor was he involved in any way with the disciplinary process for the charges Plaintiff did incur that day. (*Id.* ¶¶ 17, 19.)

Following Plaintiff's reassignment to the RHU, Plaintiff was placed in cell A-2-203-B in the A Building. (*Id.* ¶¶ 20–21.) Because it was suspected that Plaintiff had swallowed some

type of drug and refused to submit to a drug test, he was placed on "dry cell" status for observation. (*Id.* ¶ 21.) The cell in which Plaintiff was housed had a built-in padded bed and a security camera. (*Id.* ¶ 28.) The Facility Unit Head Restorative Housing Unit Docket Weekly Review from that week shows that Plaintiff was assigned to RHU on August 3, 2023, for disruptive and argumentative behavior and possible drug ingestion. (*Id.* ¶ 22 & Encl. E.)

The RHU is not designed to punish inmates. (*Id.* ¶ 23.) Rather, it is used to house inmates who are "unable to function" in general population, either for the inmate's protection, to prevent him from harming others or himself, or when the inmate's behavior threatens the orderly operation of the prison. (*Id.*) The cells in RHU are "well ventilated, adequately lighted, appropriately heated and cooled and are maintained in sanitary condition," whether or not an inmate is assigned "dry cell" status. (*Id.* ¶ 24.)

Cell lights in RHU cells are kept on at all times for security purposes but are generally dimmed at night. (*Id.* ¶ 26.) But when an inmate is on "dry-cell" status, the light in his cell is not dimmed at night. (*Id.*) In August, all housing pods, including the RHU, are air conditioned. (*Id.* ¶ 28.) Dry-cell inmates are provided only a pair of boxers and a smock for clothing. (*Id.*) If they are cold, they will not be given a blanket but can request a safety smock to be worn as an additional layer. (*Id.*) RHU Housing Unit Shift Reports from Plaintiff's time on dry-cell status show that the temperature at the beginning of each shift was 70 degrees Fahrenheit. (*Id.* ¶ 28 & Encl. G.)

Inmates on dry-cell status are offered showers three times per week. (*Id.* ¶ 29.) They are offered hygiene items to use under direct supervision while showering. (*Id.*) Dry-cell inmates are not provided with cleaning supplies, but cells are cleaned during cell inspections.

(*Id.*) Inmates in RHU, including those in dry cells, are able to sign up for a sick call to receive medical attention or sign up to see a mental-health clinician to address any psychological concerns. (*Id.* ¶¶ 34–35.)

In a "dry cell," the water for the toilet is turned off. (*Id.* ¶ 27.) When a dry cell inmate has a bowel movement, Intel staff examines the inmate's stool for any contraband before turning the water back on to flush. (*Id.*) The water is then turned back off. (*Id.*) Intel staff perform dry-cell inspections, including daily stool examinations. (*Id.*) While Plaintiff was in RHU, his cell, including the toilet, were checked daily. (Aff. of R. Hickman ¶ 8.)

The Intel Department is primarily responsible for investigating instances of inmates suspected of swallowing contraband and performs searches, including stool examinations, as part of their investigation. (*Id.*; Aff. of E. Earhart ¶ 32.) Intel staff may, alternatively, search an inmate suspected of swallowing contraband using a body scanner. (Aff. of E. Earhart ¶ 32.) RNCC first acquired a body scanner in the summer of 2023, and staff had to be trained in the proper use of the machine before body-scan searches could be performed. (*Id.*) The body scanner at RNCC was used for the first time on August 7, 2023. (*Id.*)

On August 10, 2023, and again on August 11 and August 14, Plaintiff was searched via body scan. (*Id.*) Plaintiff's August 10 body scan was performed by Lt. Higgins and detected an anomaly. (Aff. of R. Hickman ¶ 10.) Plaintiff's August 11 body scan was performed by Lt. Wolfe and also detected an anomaly. (*Id.* ¶ 11.) Plaintiff's August 14 body scan was performed by Higgins and, again, detected an anomaly. (*Id.* ¶ 12.)

Following these scans, Intel contacted RNCC's medical department to arrange for an x-ray of Plaintiff. (*Id.* ¶ 13.) The medical department took an x-ray of Plaintiff on August 15, 2023, and it revealed no anomaly. (*Id.*; Aff. of A. Taylor ¶¶ 4–5 [ECF No. 48-2].)

On August 10, 2023, after a week in the RHU, Earhart and Warden Anderson determined that Plaintiff still presented a risk to the safety and security of the institution and was not suitable to return to general population. (Aff. of E. Earhart ¶ 22.) On August 17, 2023, the ICA conducted another hearing and recommended that Plaintiff be released back to general population. (*Id.* ¶ 31.) That recommendation was approved and, the next day, Plaintiff was returned to general population and assigned cell C-1-120 in the C Building. (*Id.* ¶ 31 & Encl. H.)

Plaintiff does not offer anything to contradict Defendants' evidence. Instead, his response in opposition to summary judgment suggest he generally agrees with Defendants' summary of the facts. (*See* Pl.'s Resp. in Opp'n to Summ. J. 1–4.) However, Plaintiff disputes that he ever refused to provide a urine sample. (*See id.* at 5.) He claims he requested 16 ounces of water and some time before providing a sample, in accordance with Operating Procedure § 841.5, but that once he was suspected of swallowing drugs, he was taken to the RHU and put in a dry cell. (*Id.*) He further claims that Defendants were "wrong" to believe that Plaintiff swallowed drugs or that they found drugs in Plaintiff's cell, but does not offer any evidence, or even allege, what the substances that were swallowed and found in his cell actually were. (*Id.* at 5–6.) He also "asserts" that by August 9, 2023, Defendants knew Plaintiff had not swallowed drugs but offers no evidence to demonstrate their supposed knowledge. (*Id.* at 7.)

## II.

Summary judgment under Rule 56 "allows a case to be resolved before and without a trial when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 352 (4th Cir. 2024) (citing Fed. R. Civ. P. 56(a)). "The court's role in ruling on such a motion is not to assess the truth of any fact alleged or to weigh facts, as would a jury in finding facts, but only to determine whether facts are disputed *and* whether the disputed facts are material." *Id.* (citations omitted).

In deciding a motion for summary judgment, "the court construes all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 958 (4th Cir. 2022). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874−75 (4th Cir. 1992). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate if there are genuine disputes of material fact and "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party," *id.*, but is appropriate "when the evidence is so one-sided that one party must prevail as a matter of law." *Tekmen*, 55 F.4th at 959.

### III.

Plaintiff brings his claims under 42 U.S.C. § 1983, which authorizes a civil action by a citizen who is deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law. Claims under § 1983 have two essential elements: (1) "[a] plaintiff must allege the violation of a right secured by the Constitution and laws of the United States," and (2) the plaintiff "must show that the alleged deprivation was committed by a person acting under color of state law." *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011) (quoting *West v. Atkins,* 487 U.S. 42, 48 (1988)).

Plaintiff claims that Defendants Earhart, May, Bemis, Harman, and Hickman all violated his Eighth Amendment right to be free from cruel and unusual punishment. (*See generally* Compl.; Supplemental Compl.) For the first time, in his opposition to Defendants' motion for summary judgment, Plaintiff also claims that Defendants violated his Fourteenth Amendment due process rights by writing false charges against him. (*See* Pl.'s Resp. in Opp'n to Summ. J. 8). But "a plaintiff may not raise new claims after discovery has begun without amending his complaint." *Cloaninger ex rel. Est. of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (refusing to consider claim that was raised for the first time in plaintiff's response to defendants' motion for summary judgment); *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013) (affirming district courts refusal to consider a new theory of liability advanced for the first time in plaintiff's response to summary judgment, finding the argument was "an impermissible attempt to constructively amend the complaint"). Because Plaintiff

only includes Eighth Amendment claims in his complaint, the court limits its review to whether Defendants are entitled to judgment as a matter of law on those claims.

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Id.* (citations omitted). The Eighth Amendment also imposes duties on these prison officials, who must "provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 832).

"Whether an inmate's conditions of confinement amount to 'cruel and unusual punishment' must be measured against 'the evolving standards of decency that mark the progress of a maturing society.'" *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019), *as amended* (May 6, 2019) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). "Like any other Eighth Amendment claim, an Eighth Amendment conditions of confinement claim has (1) 'objective' and (2) 'subjective' components." *Id.* (citing *Scinto*, 841 F.3d at 225).

The objective prong "requires plaintiff to demonstrate that 'the deprivation alleged was, objectively, sufficiently serious.'" *Scinto*, 841 F.3d at 225. (quoting *Farmer*, 511 U.S. at 834). "To be 'sufficiently serious,' the deprivation must be 'extreme'—meaning that it poses 'a serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of such serious harm resulting from exposure to the challenged conditions.'" *Id.* (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)).

The subjective prong requires plaintiffs to show that the prison officials "acted with a 'sufficiently culpable state of mind.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). In conditions-of-confinement cases, a plaintiff must show that the official was deliberately indifferent, *i.e.*, that he or she "knew of and disregarded an excessive risk to inmate health or safety." *Id.* (quoting *Farmer*, 511 U.S. at 837). "[T]he plaintiff must show that the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and drew that inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837) (alterations omitted). Deliberate indifference requires more than "mere negligence" but less than intent to cause harm. *Id.* (quoting *Farmer*, 511 U.S. at 835.)

Plaintiff claims that Defendants violated his Eighth Amendment rights by causing him to endure two weeks in a dry cell in RHU. He alleges that he suffered an extreme deprivation of basic amenities, including bedding, clothing, shoes, soap, toothpaste, and other hygiene items. (*See* Compl. 4; Supplemental Compl. 1.) He further alleges that he had to eat meals in the same cell as his unflushed toilet while waiting for Intel to perform their daily stool evaluations. (Supplemental Compl. 1.) And he claims that he was exposed to "extreme cold environments" over the entire two-week period. (Compl. 5–6.) He also alleges that the constant exposure to undimmed light was severely disorienting and disrupted his sleep, amounting to "light torture." (Compl. 6.) He further claims he was not given a shower for a week. (*See* Pl.'s Resp. in Opp'n to Summ. J. 8.)

Some of Plaintiff's allegations are disproven by the undisputed evidence offered by Defendants. For examples, Defendants offer shift reports showing that, at the beginning of the day shifts on August 3, August 5, August 6 and the beginning of the night shift on August

- 11 -

6, the temperature in the RHU was 70 degrees Fahrenheit. (*See* Aff. of E. Earhart Encl. G.) Defendants have also shown that RHU inmates were offered three showers per week and did provide hygiene items for supervised use while showering. (*Id.* ¶ 29.)

And, in any event, federal courts have repeatedly held that temporary stays in dry cells where inmates have limited access to basic amenities for a time do not violate the Eighth Amendment. *See, e.g.*, *Williams v. Ozmint*, No. CIV.A. 3:08-4139, 2010 WL 3808621, at *4 (D.S.C. July 22, 2010), *report and recommendation adopted*, No. C/A 3:08-CV-4139-GRA, 2010 WL 3814287 (D.S.C. Sept. 23, 2010) (recommending summary judgment for defendants on plaintiff's claim "that his Eighth Amendment rights were violated due to his conditions of confinement in the dry cell because he did not have a mattress, blanket, sheets, clothing, running water, a sink, or a toilet," noting plaintiff had not shown "anything more than de minimis injury from the alleged conditions" or that "Defendants knew of and disregarded an excessive risk to his health and safety"); *Mitchell v. United States*, No. CIV 1:08CV195, 2010 WL 890045, at *3 (N.D.W. Va. Mar. 10, 2010), *as amended* (Mar. 11, 2010), *aff'd*, 390 F. App'x 260 (4th Cir. 2010) (dismissing Eighth Amendment claim based on dry-cell placement where plaintiff "failed to allege that his placement in the dry cell deprived him of food, shelter or medical care" or "that prison authorities were aware of any risks [Plaintiff] faced by being placed there"); *Wiley v. Kentucky Dep't of Corr.*, No. CIV.A. 11-97-HRW, 2012 WL 5878678, at *3 (E.D. Ky. Nov. 21, 2012) (dismissing plaintiff's Eighth Amendment claim based on two-week confinement in a "dry cell," in spite of allegations that "he had no running water; was unable to wash his hands after using the bathroom; endured cold temperatures; was denied

- 12 -

clean clothes, linens, and access to his personal property; and that unidentified officers verbally harassed and ridiculed him").

In *Stewart v. Wright*, 101 F.3d 704 (7th Cir. 1996), the Seventh Circuit explained why Eighth Amendment claims based on an inmate's confinement to a dry cell typically fail:

> First, to raise a successful Eighth Amendment claim, a prisoner must allege that prison officials were deliberately indifferent to an excessive risk to inmate health or safety. [*Farmer,* 114 S. Ct. at 1977]. The use of dry cells is for the purpose of discovering and securing any contraband smuggled by ingestion into the prison. *United States v. Oakley,* 731 F. Supp. 1363, 1364–66 (S.D. Ind. 1990). . . . [Plaintiff] was confined to the dry cell to serve a legitimate penological interest and not for the purpose of punishment. The culpability component of deliberate indifference analysis is clearly lacking. *Farmer,* 114 S. Ct. at 1979.
>
> Second, . . . the conditions of a dry cell do not rise to the level of a constitutional deprivation. In order to violate the Constitution, deprivations must be "unquestioned and serious" and contrary to "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Mere discomfort and inconvenience do not implicate the constitution. *Caldwell v. Miller,* 790 F.2d 589, 600–01 (7th Cir.1986). . . . Dry cell conditions such as not being able to flush the toilet or brush teeth are mere inconveniences. . . .
>
> Third, though a dry cell is restrictive, it is necessarily so in order to serve its legitimate purpose of detecting swallowed contraband. *Oakley,* 731 F. Supp. at 1364–65. While the conditions incident to preserving all bodily excrement for examination are undesirable, it is well settled that conditions which are temporary and do not result in physical harm are not actionable under the Eighth Amendment. *Harris,* 839 F.2d at 1235; *Johnson v. Pelker,* 891 F. 2d 136, 138–39 (7th Cir. 1989).

101 F.3d 704, 1996 WL 665978, at *1–2.

The Fourth Circuit recently evaluated a dry-cell claim under different factual circumstances. *See Jones v. Solomon*, 90 F.4th 198, 208 (4th Cir. 2024) (facts construed in

plaintiff's favor showed that, while Plaintiff was in a dry cell, he was as not given any means to clean his hands after defecating and was required to eat a meal without utensils after his bowel movement, was forced to search through his own feces using tongue depressors and, later, was not given any toilet paper after defecating and was not given additional clothing for almost 24 hours after "despite having some feces on his hands and clothing"). Though the court avoided the question of constitutionality, instead finding defendants were entitled to qualified immunity based on a lack of clearly established law, the Fourth Circuit did review several similar cases as part of its analysis. *See id.* at 211–12. The Fourth Circuit found that there was "no robust consensus of persuasive authority" showing the plaintiff's rights had been violated but that "[i]n cases involving less extreme situations, . . . other circuit courts have declined to find Eighth Amendment violations." *Id.* (collecting cases).

As in *Stewart*, the cases cited in *Jones*, and the other cases discussed above, the court concludes that the temporary deprivations Plaintiff experienced, while inconvenient and uncomfortable, were not so extreme as to constitute cruel and unusual punishment. Moreover, Plaintiff offers no evidence aside from his own unsworn statements that Defendant's knowingly put Plaintiff at risk for substantial harm to his health and safety. Accordingly, no reasonable jury would find in favor of Plaintiff on his Eighth Amendment claims, and Defendants are entitled to judgment as a matter of law on Plaintiff's claims.

**IV.**

For the reasons stated above, the court will grant Defendants' motion for summary judgment (ECF No. 39) and enter summary judgment in their favor.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 30th day of September, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE